**Nos. 26-5120, 26-5121, 26-5132**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

GOOGLE LLC AND YOUTUBE, LLC,

*Plaintiffs-Appellants,*

*v.*

ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
Nos. 5:25-cv-09792-EJD, 5:25-cv-09789-EJD, 5:25-cv-09795-EJD

---

# REPLY BRIEF OF PLAINTIFFS-APPELLANTS GOOGLE LLC AND YOUTUBE, LLC

---

Benedict Hur
Jonathan Patchen
Michael Rome
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
(415) 693-2000

Elizabeth B. Prelogar
Raymond P. Tolentino
Ephraim A. McDowell
COOLEY LLP
1299 Pennsylvania Ave., NW,
Suite 700
Washington, DC 20004
(202) 842-7800
eprelogar@cooley.com

*Counsel for Plaintiffs-Appellants Google LLC and YouTube, LLC*

# TABLE OF CONTENTS

**Page**


INTRODUCTION ....................................................................................1

ARGUMENT ..........................................................................................2

I. YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS.............3

A. The Personalized-Feed Provisions Violate the First Amendment.........................................................................4

1. The personalized-feed provisions burden YouTube's and its minor users' speech rights ................4

a. YouTube's personalized feeds are protected expression ..........................................................4

b. The personalized-feed provisions also burden minor users' First Amendment rights .....17

2. The personalized-feed provisions are content-based restrictions that fail any form of heightened scrutiny ...........................................................19

a. The personalized-feed provisions are content-based.....................................................19

b. The personalized-feed provisions fail any form of heightened scrutiny ................................23

B. The Act's Default Restrictions Are Void for Vagueness ........33

II. YOUTUBE AND ITS MINOR USERS FACE IRREPARABLE INJURY WITHOUT AN INJUNCTION..............33

III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT AN INJUNCTION.........................................................35

CONCLUSION ....................................................................................36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) ....................................................................35

*Ark. Educ. Television Comm'n v. Forbes*,
523 U.S. 666 (1998)..........................................................................................9

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)............................................................................ 17, 29-30

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022) .......................................................................... 2-3

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022)..........................................................................................22

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994)..........................................................................................29

*Clark v. Cmty. for Creative Non-Violence*,
468 U.S. 288 (1984)..........................................................................................3

*Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*,
412 U.S. 94 (1973)............................................................................................7

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) (en banc) ..........................................................30

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
447 U.S. 530 (1980)........................................................................................20

*Ctr. for Fair Pub. Pol'y v. Maricopa Cnty.*,
336 F.3d 1153 (9th Cir. 2003) ........................................................................22

*Doe v. Harris*,
772 F.3d 563 (9th Cir. 2014) ......................................................................3, 24

*Gammoh v. City of La Habra*,
395 F.3d 1114 (9th Cir. 2005) ....................................................................23, 28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Goldie's Bookstore, Inc. v. Super. Ct.*,
739 F.2d 466 (9th Cir. 1984) ....................34

*Grand River Enters. Six Nations, Ltd. v. Knudsen*,
No. 23-35494, 2024 WL 2992503 (9th Cir. June 14, 2024) ....................34

*Imperial Sovereign Ct. of Montana v. Knudsen*,
170 F.4th 820 (9th Cir. 2026) ....................3, 23

*Jacobs v. Clark Cnty. Sch. Dist.*,
526 F.3d 419 (9th Cir. 2008) ....................25

*Lamont v. Postmaster General*,
381 U.S. 301 (1965) ....................18

*Matal v. Tam*,
582 U.S. 218 (2017) ....................20

*McCullen v. Coakley*,
573 U.S. 464 (2014) .................... 31-32

*Meinecke v. City of Seattle*,
99 F.4th 514 (9th Cir. 2024) ....................3, 19, 21

*Menotti v. City of Seattle*,
409 F.3d 1113 (9th Cir. 2005) ....................20

*Minority Television Project, Inc. v. FCC*,
736 F.3d 1192 (9th Cir. 2013) (en banc) ....................30

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ....................*passim*

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ....................*passim*

*NetChoice, LLC v. Bonta*,
170 F.4th 744 (9th Cir. 2026) ....................33

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*NetChoice, LLC v. Yost*,
180 F.4th 268 (6th Cir. 2026) ....................................................................32

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011)....................................................................................20, 23

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,
240 F.3d 832 (9th Cir. 2001) ........................................................................34

*TikTok Inc. v. Garland*,
604 U.S. 56 (2025)........................................................................................21

*Turner Broad. Sys., Inc. v. FCC*,
512 U.S. 622 (1994)....................................................................................21, 24

*Turner Broad. Sys., Inc. v. FCC*,
520 U.S. 180 (1997).................................................................................23, 25, 31

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995)........................................................................................24

*United States v. Playboy Ent. Grp., Inc.*,
529 U.S. 803 (2000)........................................................................................18

*Video Software Dealers Ass'n v. Schwarzenegger*,
556 F.3d 950 (9th Cir. 2009) ........................................................................25

*Yim v. City of Seattle*,
63 F.4th 783 (9th Cir. 2023) .........................................................................30

**Statutes**

Cal. Health & Safety Code § 27000.5(a) .....................................................20

# INTRODUCTION

The State's position is both erroneous and sweeping: The State argues personalized feeds reflect no editorial judgment and so warrant no First Amendment protection—which would give states free rein to outright ban personalized feeds for *all* users (including adults) on *all* websites and apps, from LinkedIn to Spotify to the New York Times. Notably, the State does not deny that its theory would allow it to ban personalization across the internet—it merely asserts it has not done so *yet*. But California recently enacted a law that bans personalized feeds for all users under 16, showing that SB976 is likely just the beginning of the State's efforts to broadly curtail free speech online.

The district court embraced the State's categorical position, characterizing all personalized feeds as non-expressive "'dumb pipes' that merely emit what they are fed." 1-ER-0011 (citation omitted). But that position disregards this Court's guidance in *NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025). There, the Court emphasized that "the unique design of each platform and its algorithm affects whether the algorithm at issue is expressive." *Id.* at 1014. Under the State's theory, however, the participation of individual members and platform-specific facts are wholly *unnecessary*, because no personalization algorithm is expressive regardless of how "unique" its "design" is. *Id.*

Unlike the State, YouTube took *NetChoice* seriously, providing extensive

evidence about the "human editorial directions" incorporated into its algorithm, *id.*, such as YouTube's objectives of promoting long-term user satisfaction by recommending personally interesting, diverse content and delivering age-appropriate content to minors in different age groups. Rather than grappling with the evidence establishing the expressive nature of YouTube's algorithm, the State lumps all platforms together and invokes settlements reached with different platforms in different cases. The State also leans on broad-brush assertions about social media writ large to paper over its lack of evidence that YouTube's personalized feeds harm minors.

At bottom, California contends that it can force YouTube (and any website or app that provides personalized feeds) to make its "distinctive compilations of expression" less interesting without confronting the First Amendment. *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024). But the First Amendment "does not go on leave" merely because a state rebrands interesting speech as addictive or targets expressive judgments implemented using algorithms. *Id.* at 719. The district court's contrary holding is as wrong as it is unprecedented. This Court should reverse.

## ARGUMENT

This Court reviews "[t]he district court's interpretation of the underlying legal principles … de novo," *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022) (citation omitted), and "[i]n First

Amendment cases," "make[s] an independent examination of the whole record," *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (citation omitted). In denying YouTube's preliminary-injunction motion, the district court "got the law [wrong]" and disregarded the YouTube-specific record. Answering Brief (AB) 76. It therefore necessarily abused its discretion. *See Cal. Chamber of Com.*, 29 F.4th at 475 ("[A] district court abuses its discretion when it makes an error of law." (citation omitted)).

## I. YOUTUBE IS LIKELY TO SUCCEED ON THE MERITS.

As the district court recognized, YouTube need only "mak[e] a colorable claim that its First Amendment rights … are threatened with infringement" before "the burden shifts to the government to justify the restriction on speech." 1-ER-0008 (quoting *Cal. Chamber of Com.*, 29 F.4th at 478). YouTube easily clears that threshold, and the State cannot justify the personalized-feed restrictions under any level of heightened scrutiny.[1]

[1] The State contests the relevant standard (at 52) by citing *Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984), but that case involved summary judgment and did not address the preliminary-injunction standard. The Ninth Circuit recently confirmed that the "colorable claim" standard applies to "a preliminary injunction in the First Amendment context." *Imperial Sovereign Ct. of Montana v. Knudsen*, 170 F.4th 820, 842 (9th Cir. 2026) (citation omitted). And the State's assertion that the colorable-claim standard "applies only where there is no dispute that a plaintiff's conduct is … protected," AB52 & n.9, conflicts with *Doe v. Harris*, 772 F.3d 563 (9th Cir. 2014). There, this Court considered whether "registered sex offenders are entitled to full First Amendment protection" and still applied the colorable-claim standard. *Id.* at 570.

### A. The Personalized-Feed Provisions Violate the First Amendment.

#### 1. The personalized-feed provisions burden YouTube's and its minor users' speech rights.

The State's position that SB976's personalized-feed provisions do not implicate the First Amendment contradicts bedrock free-speech principles, defies *Moody* and *NetChoice*, and threatens the right to speak and listen freely on the internet.

##### a. YouTube's personalized feeds are protected expression.

YouTube's personalized feeds are expressive because they reflect YouTube's editorial judgments about how to "organize and prioritize" third-party speech, *Moody*, 603 U.S. at 716, and "promote[] [YouTube's] own message to users" that it values individually interesting, diverse, and age-appropriate content, *NetChoice*, 152 F.4th at 1014. That remains true even though YouTube uses an algorithm to implement its expressive judgments as to each user. In *Moody*, the Court held that YouTube's feeds are expressive while explicitly recognizing that they are "achieved through the use of algorithms" and are "most often based on a user's expressed interests and past activities." 603 U.S. at 734-35.

The State agrees (at 47) that if a feed "is the product of human editorial judgment" then it "is protected." But it argues that YouTube's personalized feeds do not reflect any human editorial judgment based on two theories. First, the State contends that editorial judgment is limited to the granular decision to show users

content on a specific topic or subject and does not encompass YouTube's first-order decision to show users content that is interesting, relevant, and valuable to them. Second, the State suggests that even if that first-order decision is an editorial judgment, the resulting feeds are unprotected because YouTube uses an algorithm to help implement that judgment. Both theories are baseless.

To begin, the State advances an artificially narrow conception of "editorial judgment" that is foreign to the First Amendment. According to the State, editorial judgment consists of "filling in th[e] blank" with content. AB56. But YouTube satisfies that test because it "fills in the blank" with content that is interesting, relevant, and valuable to an individual user; that is novel and diverse; and that is appropriate for minors in different age groups. The State responds by redefining the test, arguing that only filling in the blank with specific topics—like "scholarships, dancing, [or] dinosaurs"—qualifies as editorial judgment. AB56-57. That cramped definition of editorial judgment contravenes basic free-speech principles. Consider a TV network whose executives decide it should carry only the most "entertaining" programs but leaves it to individual producers to decide which shows qualify. Or a newspaper whose editorial board decides it should prioritize "provocative" content but charges individual editors with deciding which subjects fit the bill. Under the State's logic, only the individual producers and editors—but not the executives and editorial board—have made protected editorial judgments. That distinction lacks

any principled basis: The threshold decision about what genre of content to convey shapes the audience's experience just as much as the downstream decisions about what specific topics or materials fall within the chosen genre.

Nor does the State cite any authority supporting its arbitrarily narrow understanding of editorial judgment. The State points to language in *Moody* explaining that editorial judgment involves "mak[ing] decisions about the 'content of the [compilation]' and '[t]he choice of material to go into' it." AB54 (quoting *Moody*, 603 U.S. at 728). But YouTube's decisions to recommend videos that are interesting, not repetitive, and age-appropriate for individual users *are* "decisions about the 'content of'" its feeds and the "material to go into" them. *Moody* also indicates that editorial judgments "rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so)." AB54 (quoting *Moody*, 603 U.S. at 738). But again, YouTube's personalized feeds reflect its belief that messages tailored to a user's interests and age group are "more appropriate" than other messages. So *Moody* provides no support for the State's myopic conception of editorial judgment.[2]

---

[2] The State attempts to rehabilitate the district court's erroneous "moral valence" test by claiming that the court was merely paraphrasing *Moody* and did not indicate that editorial judgments "need to be based on an idea's 'goodness' or 'badness.'" AB71 (citation omitted). But the district court explicitly stated that YouTube's decision "to show a user a series of cat videos" "is not accompanied by any editorial judgment" because that decision is not based on a belief "that cats are 'good'

*Moody* instead affirmatively refutes the State's assertion that only choices about specific subjects qualify as editorial judgments. In *Moody*, the Court held that YouTube's content-moderation policies reflect protected editorial judgments while observing that those policies identify both content on specific topics, like "hate speech" or "violent … content," and content defined by more abstract qualities, like "deceptive" or "trustworthy" content. 603 U.S. at 735. The State's theory cannot be squared with that holding. After all, under that theory, YouTube's policy against "deceptive" content would not reflect editorial judgment because it could encompass many different topics, ranging from pyramid schemes to AI-generated videos of the President.

The State's reliance (at 54, 57) on *Columbia Broadcasting System, Inc. v. Democratic National Committee*, 412 U.S. 94 (1973), fares no better. *Columbia* states that "editing is selection and choice of material." *Id.* at 124. That description aptly fits YouTube's activities: From the billions of videos on its platform, YouTube has "select[ed] and cho[sen]" to recommend material that, in its judgment, is interesting, relevant, and valuable to individual users. *Id.*; *see* Br. of First Amendment Scholars 8 & n.2 (explaining that YouTube makes editorial choices about "what specific content will interest a user" by, for example, "promot[ing]

---

animals" and has "nothing to do with whether its boardroom believes cats are good or bad." 1-ER-0018.

diversity in channels and topics" and "incorporat[ing] judgment calls about the amount of novel and unfamiliar content to show each user"). The State argues that YouTube's judgments about what content to display do not "involve *human* selection or choice." AB57 (emphasis added). But humans at YouTube are the ones who make the first-order editorial decision to show users content that is personally interesting, sufficiently diverse, and tailored to different under-18 age groups. And it is because of that first-order decision that a child receives a recommendation for a Sesame Street clip, while a teen interested in robotics receives a recommendation for a mechanical-engineering video.

Relatedly, the State argues that YouTube cannot be exercising editorial discretion because its singular goal is to maximize engagement through "number-crunching." AB48. Neither the premise nor the conclusion is correct.

First, the record refutes the claim that YouTube's goal is to maximize engagement and that its only measure of what is "interesting" is what will get users to spend more time on the platform. AB17. Rather, YouTube's objective is to "optimize[] for long-term user satisfaction" over "short-term engagement or maximizing … time" spent "on the platform." 7-ER-1337 ¶ 13. In asserting otherwise, the State relies on documents that are over two decades old and do not reflect YouTube's current approach. YouTube's goal has "always" been to maximize "value" to each user, but twenty-plus years ago, "watch time was … the

best way [YouTube] had of measuring it." 2-SER-489. Since then, YouTube has developed more advanced metrics that better align with its objective of delivering long-term value—reflected in record evidence that the State misconstrues. *See* Opening Brief (OB) 35-36 (explaining that "capped valued watchtime" prioritizes a "first hour of valuable content" over total hours and deprioritizes "engaging but … not valuable" content).

Second, selecting content based on what will be relevant, valuable, or purely engaging to one's audience is a quintessential editorial judgment. Since time immemorial, editors have decided what to publish based on what is most likely to be relevant to their audiences and maximize subscriptions, views, or ratings. What will "generate[] … interest" with one's audience is often the primary basis for deciding what articles to include in a magazine or what segments to prioritize in a news broadcast or talk show. *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 682-83 (1998). And the Supreme Court has consistently affirmed that the First Amendment protects those decisions. *See* OB21.

Even the State tacitly admits this point. It notes that "'Fox News [may] convey an editorial criticizing Kamala Harris because they think that's what their audience would like,' even if that is the only reason why Fox chooses to convey that editorial." AB63 (citation omitted). But if that is a protected editorial judgment (as the State concedes), then so is YouTube's decision to convey videos based on "what

[its] audience would like." *Id.* The State's only asserted "distinction … is that human editors at Fox News" select what topic will be engaging to its audience ("an anti-Harris editorial"), whereas YouTube uses an algorithm to help select topics that will be individually interesting to each user. *Id.* That distinction rests entirely on the State's *separate* (and likewise erroneous) argument that using an algorithm to implement that editorial judgment renders it unprotected. The State's felt need to pivot to its secondary argument confirms that it cannot credibly defend its threshold position that the overarching judgment to convey content that is interesting, valuable, and age-appropriate for each user is not an editorial judgment at all.

The State's alternative theory is equally unavailing: *Moody* teaches that when humans make a first-order editorial judgment, "the First Amendment protects" that judgment—even if an algorithm largely implements it "without a person in the loop." 603 U.S. at 745-46 (Barrett, J., concurring); *id.* at 743-45. Resisting that logic, the State seeks to divide up YouTube's decision to convey a personalized recommendation into three levels:

- Level 1: The decision to show a user content that is interesting, relevant, and valuable to her.
- Level 2: The decision that the user will find a sports video interesting, relevant, and valuable.
- Level 3: The decision to show the user a specific sports video.

The State concedes that humans at YouTube make the first-order decision. But it asserts that because YouTube uses an algorithm to help carry out the second- and

third-level decisions, the resulting feeds are not the product of human editorial judgment.[3]

*Moody* refutes that assertion. The content-moderation decisions at issue in *Moody* could be disaggregated in the same way. Consider again YouTube's content-moderation policy against "deceptive" content:

- Level 1: The decision that "deceptive" content should be removed from the platform.
- Level 2: The decision that pyramid-scheme videos are "deceptive."
- Level 3: The decision to remove a specific pyramid-scheme video.

As with personalization, humans at YouTube make the first-order judgment but use algorithms to help implement that judgment at the second and third levels. So under the State's theory, feeds reflecting YouTube's content-moderation policy against "deceptive" content would not be protected. But *Moody* held the opposite. *See* 603 U.S. at 735. YouTube's opening brief highlighted this fundamental conflict between the State's argument and *Moody*, *see* OB32-33—tellingly, the State offers no

[3] Contrary to the State's suggestion, the decisions beyond the first level also reflect human editorial judgment. For example, the algorithm does not independently arrive at the decision to show a sports video, rather than a physics video, to a user who has watched math videos. That is the product of human engineers' judgment that physics and math are not sufficiently diverse topics. *See* OB33. The State suggests (at 65 n.13) that it is unclear whether humans make this decision, but the relevant declaration plainly states that it is "a subjective decision that YouTube had to make" and then "implement … through computer code." 2-ER-0250 ¶ 13. The State then argues (at 65-66 n.13) that deciding whether physics and math qualify as diverse topics is not regulated by SB976. But the State never explains how YouTube could avoid recommending physics videos to a user who has watched math videos without considering that user's viewing history—information SB976 places off limits.

response.

The State's remaining arguments about algorithms also fail to distinguish *Moody*. The State asserts that YouTube's personalized feeds are unprotected because "feed-personalization algorithms" (1) "have no understanding of the actual content" of the feeds, (2) result in "outputs" that humans "cannot predict" with "certainty," (3) sometimes convey content that YouTube does not want to promote, and (4) are implemented across billions of users and videos. AB11, 16, 20, 22, 25, 61. All of that is also true of content-moderation algorithms. *See* 4-ER-0839–40 ¶ 57; 2-ER-0264–67 ¶¶ 16-20; 7-ER-1363–64 ¶¶ 38, 40. The State quotes from Dr. Zervas's report for the proposition that "recommendation systems can result in outputs that a system designer may not be able to predict exactly in advance." AB22 (quoting 4-ER-0832 ¶ 48). But it selectively omits the first part of Dr. Zervas's statement in which he explains that "*both* [*machine-learning*] *moderation* and recommendation systems" produce such outputs. 4-ER-0832 ¶ 48 (emphasis added). And the State does not disclaim its expert's opinion that content moderation and personalization "*both* lack the certainty required for constitutionally protected expression." 3-ER-0332 ¶ 38 (emphasis added). So the State cannot be right unless *Moody*—which held that the First Amendment protects YouTube's content-moderation system—was wrong.

Like the district court, the State draws an artificial and unsupported distinction

between personalization and content moderation. The State suggests that content moderation consists solely of decisions to remove or downrank specific categories of content like "nudity," AB22, and asserts that "nothing in SB976 restricts" YouTube from "content-moderating any posts," AB33-34. But the State ignores YouTube's other content-moderation policies that rely on information about the user—and are thus impeded by SB976. For example, YouTube recommends to under-13 minors—but not to older minors—content geared toward child development (like videos "encourag[ing] children to use their imagination," 7-ER-1342 ¶ 29). And it avoids repeatedly recommending to teens content that is innocuous as a single video but potentially problematic if viewed in high quantities (like videos that "display[] aggression," 7-ER-1343 ¶ 31). The State has never explained how YouTube could implement those age-based content-moderation policies while complying with SB976.

If accepted, the State's position would also have staggering implications for traditional news media. The State asserts that an analogy to "newspapers like the New York Times" is inapposite because "editors of the Times select which articles go on the front page" and do not produce "different versions of their paper" for each subscriber. AB61-62. While that may have been true in an earlier era, it is not true today. "Newspapers, including the *New York Times* and *Washington Post*, have integrated algorithms onto their respective home pages to show 'articles uniquely

tied to a reader's interests, location or reading history.'" 2-ER-00267 ¶ 21 & n.39 (citation omitted). The Times explains that its "personalization efforts" include "using algorithms to generate content recommendations" "based on your engagement on [its] sites and apps." *Personalization*, N.Y. Times Help Ctr. (Dec. 19, 2025), https://perma.cc/QKS5-AZ35.

Under the State's logic, it could ban the Times from individually tailoring articles in its app because Times editors do not handpick topics for each subscriber's feed. Likewise, the State's logic means that Fox News's decision to convey an editorial criticizing Kamala Harris would no longer be First Amendment-protected if Fox used an algorithm to determine that its audience would like anti-Harris content. The State's position would therefore sharply curtail free-speech protections for traditional news media simply because that media has transitioned "from the physical to the virtual world." *Moody*, 603 U.S. at 717.

In the end, the State's categorical position is in fundamental tension with both *Moody* and *NetChoice*. The logical consequence of the State's position is that *no* personalized feed—regardless of the value-laden judgments and human decisions shaping it—qualifies for First Amendment protection. After all, personalized feeds by definition involve the use of an algorithm to help select topics or posts that are personalized for each individual—and that is the very feature that, according to the State, strips such feeds of First Amendment protection.

That position conflicts with *Moody*, where the Court held that YouTube's feeds are expressive while recognizing that the "key to the scheme" is the "use of algorithms" to select a subset "[o]f the billions of posts and videos" on the platform for "a user's customized feed or recommendations list." 603 U.S. at 734-35. The State misleadingly suggests (at 37) that the Court reserved judgment on all personalized feeds in footnote 5. But that footnote specifically contrasted "feeds whose algorithms respond *solely* to how users act online," merely "giving them the content they appear to want," with "YouTube's main feeds," which the Court found protected. *Moody*, 603 U.S. at 736 n.5 (emphasis added). And rightly so: YouTube's Recommender System responds not only to how users act online but also incorporates YouTube's own values, like promoting novelty and diversity, and therefore will recommend content that users may *not* "appear to want" based solely on their viewing history. OB26-27.

The State's amici erroneously claim that YouTube's feeds are "precisely" the feeds described in *Moody* footnote 5. *See, e.g.*, Br. of First Amendment Professors 4. But the State itself admits (at 64) that YouTube's Recommender System does not "'solely' give users what they want" based on how they act online. The State instead argues that even if YouTube's algorithm incorporates YouTube's values, it is still unprotected because "humans are not" picking the topics for each feed. AB64. But *Moody* did not cast doubt on using algorithms to help select topics for each user's

"customized feed," 603 U.S. at 734—it reserved judgment on only a subset of personalization algorithms that, unlike YouTube's, respond solely to user activity.

This Court's decision in *NetChoice* also undermines the State's categorical position. The Court held that individual platforms must participate in the litigation because some personalized feeds are likely protected and some are not, depending on "the unique design of each platform and its algorithm." *NetChoice*, 152 F.4th at 1014. The Court explained that a personalization algorithm that "implements human editorial directions" and "promotes a platform's own message to users is likely to be protected speech," whereas a personalization algorithm that merely "reflect[s] users' revealed preferences to them" is likely not expressive. *Id.* But under the State's theory, it makes no difference whether a personalization algorithm reflects a platform's message and first-order editorial judgments or mechanically gives users what they appear to want—no personalization algorithm satisfies the State's requirement that humans handpick topics for each individual user's feed. If the State were correct, this Court would have simply held that none of NetChoice's members' personalized feeds are protected because all use an algorithm to "fill in the blank" at the level of specific subjects and posts.

The State's position that personalized feeds are categorically unprotected threatens vast quantities of online speech. The State's only response is that not all the troubling consequences that could flow from its legal arguments have yet come

to fruition. *See* AB75-76. But the State's legal *reasoning* extends far more broadly than SB976—and, if accepted, could embolden states to enact all manner of even more sweeping and speech-restrictive regulations. Indeed, after the district court's decision here, the State outright banned personalization—even with parental consent—for users under 16. *See* California Assembly Bill 1709 (2026). Notably, the State does not deny that its theory would allow it to categorically ban personalized feeds for *adults*—not just on social-media platforms but on all websites and apps, from Spotify to the New York Times. The State is wrong to suggest that such a substantial encroachment on expression triggers no First Amendment scrutiny at all.

**b. The personalized-feed provisions also burden minor users' First Amendment rights.**

The personalized-feed provisions also burden the First Amendment rights of YouTube's minor users. YouTube's personalized compilations are themselves protected expression, and SB976 directly restricts minors' right to receive those compilations without parental consent. *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794-95 & n.3 (2011). But the law also independently burdens minors' ability to access the underlying posts.

The State asserts that "[a]ll posts remain accessible." AB73. But SB976 would force minors who could not obtain parental consent to search through billions of videos on YouTube for the small fraction that is interesting and relevant to them—

videos they may not know to search for to begin with. The State cannot credibly contend that being forced to rely on manual search does not even *burden* minors' First Amendment rights. If a State passed a law providing that minors may only read newspapers with articles arranged by alphabetical order, that would plainly burden minors' speech rights. It would be no answer that minors retain the "right to receive [the news]." AB73.

The State claims (at 74) that YouTube "cite[s] no authority" for the proposition that making it more difficult to access speech is a cognizable First Amendment burden. But the State ignores *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000), *see* OB43, which held that a law restricting access to explicit TV programming for part of the day was subject to "the same rigorous scrutiny" as "a complete prohibition," 529 U.S. at 812. Similarly, in *Lamont v. Postmaster General*, 381 U.S. 301 (1965), the Court held that a law requiring individuals to confirm their desire to receive certain political mail was an "unconstitutional abridgment of the [recipients'] First Amendment rights." *Id.* at 307. There can thus be no doubt that SB976 abridges minor users' First Amendment rights even if it "inhibit[s]," rather than fully blocks, their access to content on YouTube. *Id.*

The inevitable result of SB976 will be to force platforms to present homogenous feeds organized chronologically or by generic popularity. *See* AB11

(proposing that platforms "sort[] posts … chronologically"). Amici describe how SB976 will therefore disproportionately harm minors belonging to marginalized groups or with specialized interests by impeding their ability to find relevant content and like-minded communities. *See* Br. of Chamber of Progress 4, 23-25; Br. of Center for Democracy & Technology 10. The State's only response is that YouTube could fundamentally reorganize its platform into siloed feeds, like "LGBTQ+-support feeds" or "women-in-STEM" feeds. AB76. But YouTube's personalized feeds account for minors' multifaceted identities and interests rather than reducing them to a single dimension. And more fundamentally, the State's proposal illustrates the extent to which the State seeks to micromanage YouTube's decisions about how to "organize and prioritize" content—decisions that fall within the heartland of the First Amendment. *Moody*, 603 U.S. at 716.

#### 2. The personalized-feed provisions are content-based restrictions that fail any form of heightened scrutiny.

The State cannot satisfy its "burden … to justify [SB976's] restriction on speech," *Meinecke*, 99 F.4th at 521 (citation omitted), because the personalized-feed provisions are content-based restrictions that fail any level of heightened scrutiny.

##### a. The personalized-feed provisions are content-based.

The personalized-feed provisions are content-based because they target speech with a particular quality tied to its communicative effect on the listener. The State does not contest that SB976 is content-based if it restricts "speech that is likely

to be interesting, relevant, and valuable to an individual user." AB78. Instead, the State claims that the law does not target speech on that basis. But SB976's restriction on personalized speech is not some "hidden motive" underlying the law—it is "the literal command of the restraint." AB78-79 (quoting *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005)). YouTube cannot recommend content that is likely to be interesting, relevant, and valuable to each user without considering "information provided by the user, or otherwise associated with the user." Cal. Health & Safety Code § 27000.5(a). The State's claim that SB976 does not regulate personalized speech is especially far-fetched when the State itself describes the law as regulating "personalized feeds." *See, e.g.*, AB3.

Therefore, the analysis here is dictated by the Supreme Court's cases deeming laws that target "controversial" or "disparag[ing]" speech to be content-based. *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 532, 537 (1980); *Matal v. Tam*, 582 U.S. 218, 231, 243 (2017). The State seeks to distinguish those cases on the ground that they involved "express content-based provisions." AB79 n.20. But a law with the "practical effect" of restricting access to content that is interesting to an individual user is not exempt from heightened scrutiny merely because it does not use the term "interesting" on its face. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 565 (2011) (considering the "practical operation" and "inevitable effect of a statute" in determining whether it is content-based (citations omitted)). Nor can the State

escape SB976's content-based nature by claiming that the law merely "regulates … the *mechanism*" of personalized feeds. AB49. "[I]ncanting the word[]" mechanism "over a content-based restriction does not transmute it into one that is content neutral." *Meinecke*, 99 F.4th at 523.

That YouTube must change the content of its speech to comply with SB976 confirms that it is content-based. The Supreme Court has held that a law is content-based where speakers can "'avoid or mitigate' the effects of the [law] by altering their speech." *TikTok Inc. v. Garland*, 604 U.S. 56, 71 (2025) (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 644 (1994) (*Turner I*)). To "'avoid or mitigate' the effects" of SB976, YouTube must change the expressive compilation of videos displayed in its feeds, thereby "altering [its] speech." *Id.* The State admits as much: It suggests that YouTube comply by "modifying the algorithms that are already being used to curate content," so that they "display[] posts chronologically" instead. Dkt. No. 112 at 9, *Google LLC v. Bonta*, No. 5:25-cv-09795 (N.D. Cal. Aug. 14, 2026). A law that prohibited librarians from recommending books based on a patron's reading history and interests would plainly be content-based because librarians would have to change the content of their recommendations—the same principle applies here.

SB976 is also content-based because it uses personalization as a "proxy" to shield minors from content on disfavored "subject matter[s]." *City of Austin v.*

*Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71, 74 (2022). In attempting to explain why personalized feeds are harmful, the State repeatedly invokes speech on topics like self-harm, disordered eating, and body image. *See, e.g.*, AB25 ("highly depressive content"); AB26 ("content related to eating disorders"); AB27 ("suicide and self-harm videos"); *see also* OB46 (same for State's experts and legislative findings). Of course, the State provides no evidence to support the notion that personalized feeds display more "bad" content than alternatives. But in any event, by justifying SB976 on the ground that it will limit minors' access to content on particular subjects, the State effectively concedes that the law is content-based. And the State's claim that it is just as interested in suppressing minors' access to content on other topics like "the virtues of staying in school or saying 'no' to drugs" is not plausible. AB81.

Finally, the State lays bare that SB976 is content-based by invoking the "secondary effects" doctrine. AB80. That doctrine's entire premise is that intermediate scrutiny may apply to a small class of speech regulations that are "quite obviously content based." *Ctr. for Fair Pub. Pol'y v. Maricopa Cnty.*, 336 F.3d 1153, 1164 (9th Cir. 2003). As explained below, that doctrine does not apply here—but the State's reliance on secondary effects further confirms that "the statute is content based." *Id.*

**b. The personalized-feed provisions fail any form of heightened scrutiny.**

Whether analyzed under strict or intermediate scrutiny, the personalized-feed provisions cannot survive.

To start, SB976 fails to advance a "governmental interest[] unrelated to the suppression of free speech." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997) (*Turner II*). The speech-suppressive rationale behind the personalized-feed provisions is straightforward: The State thinks personalized feeds are too effective in presenting speech that minors find compelling. But "[t]hat the State finds expression too" compelling "does not permit it to quiet the speech or to burden its messengers." *Sorrell*, 564 U.S. at 577-78.

The State's reliance on the "secondary effects" doctrine (at 80) is misplaced. That doctrine applies only where a law "regulates speech that is sexual or pornographic" and "the primary motivation … is to prevent secondary effects." *Gammoh v. City of La Habra*, 395 F.3d 1114, 1123 (9th Cir. 2005). Neither condition is met here because SB976 regulates all personalized content and targets "the *primary* effects of the speech" by "restrict[ing] speech because of concerns about its effects on the audience." *Knudsen*, 170 F.4th at 856. The State claims (at 80 n.21) that the doctrine applies regardless of whether the restricted speech is sexual or pornographic. But in *Gammoh*, this Court held that the doctrine applies only if *both* "conditions" described above "are met." 395 F.3d at 1123. And the State cites

no case in which this Court has applied the doctrine outside the context of sexually explicit speech.

The State asserts that *NetChoice*'s analysis of SB976's private-mode provision supports application of the secondary-effects doctrine here. But *NetChoice* never invoked that doctrine. And the State in *NetChoice* defended the private-mode provision based solely on its interest in "protect[ing] minors from being exploited by strangers online," Dkt. No. 33.1 at 53, *NetChoice, LLC v. Bonta*, No. 25-146 (9th Cir. Feb. 27, 2025)—an interest plainly unrelated to suppressing speech. Here, by contrast, the State's interest is tied directly to suppressing speech that it thinks minors will find too interesting.

Even if the personalized-feed provisions were grounded in a valid state interest, they would not be sufficiently tailored. Under intermediate scrutiny, the State must "demonstrate that … the regulation will in fact alleviate" "the recited harms … in a direct and material way." *Doe*, 772 F.3d at 577 (citation omitted). The State attempts to avoid that standard by observing that it originated in a plurality opinion. AB89 n.23 (citing *Turner I*, 512 U.S. at 664 (plurality opinion)). But the very next Term, the Supreme Court applied it in a majority opinion. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 475 (1995). And this Court has

since adopted it as the governing intermediate-scrutiny standard in this Circuit.[4]

In any event, the State cannot satisfy even its preferred formulation of the standard: The State's conclusion that personalized feeds cause harm to minors is not "supported by substantial evidence in the record." AB84 (quoting *Turner II*, 520 U.S. at 211). The State cannot point to any evidence, much less "substantial evidence," establishing a causal or even correlative relationship between personalization and harm to minors.

The only source cited in SB976's legislative findings is a 2023 Surgeon General's report. But that report addresses potential harm from social-media use generally, not personalized feeds specifically. And even as to social media generally, the report does not reach a definitive conclusion, stating that "[a]t this time, we do not have enough evidence to determine" if social media harms minors and emphasizing that "[m]ore research is needed to fully understand the impact of social media." 3-MetaER-500. The Senate and Assembly reports on SB976 likewise focus on social media as a whole, and the only citations in those reports that even arguably reference personalized feeds consist of articles published in *The New Yorker* and *Fast Company*—not empirical studies or other reliable evidence. *See* 3-

[4] The State claims that *Doe*'s recitation of the standard is dicta. AB89 n.23. But this Court has applied the same standard in numerous other cases. *See, e.g.*, *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 962 (9th Cir. 2009); *Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 436 (9th Cir. 2008).

MetaER-483 & n.8; 5-TikTokER-890–91 & n.13.

Even considering evidence that was not before the legislature, the State falls short. In over 500 pages of expert materials, the State failed to identify a single peer-reviewed or published study showing that personalization causes or is correlated with harm to minors. *See* OB49-50. The State maintains that studies that have not been peer-reviewed are good enough. AB90. But peer review is the "usual means through which the expert scientific community assesses hypotheses and evidence." 2-ER-0281–82 ¶ 15 & n.8. Anyone could claim to have conducted a study purporting to establish a scientific conclusion. Unless a study has been peer-reviewed, there is no way to "ensure that the methods of data gathering and analysis used in the study" actually "support[] the study's claims." *Id.* And contrary to the State's assertion, its experts have not "cited peer-reviewed studies that support" the notion that personalized feeds "cause harm." AB91. In fact, the cited studies all address social media writ large rather than personalized feeds. *See* 1-SER-255–56 ¶¶ 17-18 (citing studies in which participants "gave up or cut back on social media"); 4-SER-1003–05 ¶ 69 (examining "correlations" with "time spent on social media").

The State contends that evidence "address[ing] harms stemming from social-media use generally" should suffice. AB88. Its amici likewise rely on purported harms from social media as a whole. *See, e.g.*, Br. of Local Civil Prosecutors 12-18. But the personalized-feed provisions "specifically restrict access to personalization"

and do not prevent minors from accessing social media or other features. 3-ER-0455 ¶ 24. So "empirical research must be brought to bear as to whether personalization specifically harms the physical or mental health of minors." *Id.* The State offered no such evidence. Indeed, as to YouTube, the State's evidence suggests the opposite: The State relies on a study that affirmatively found no relationship between personalization on YouTube and harm to minors. 2-ER-0284 ¶ 20. And even assuming (inaccurately) that additional time on social media is associated with harm, the State cites another study finding that removing personalization *increased* time spent on YouTube. 3-ER-0490 ¶ 79. Once again, the State lumps all platforms together despite the as-applied challenge here and never engages with this YouTube-specific evidence.

The State claims that *NetChoice*'s analysis of SB976's private-mode provision proves that it need not present evidence about personalization to justify a restriction on personalized feeds. That misconstrues *NetChoice*. There, the Court concluded that private mode is logically related to preventing minors from "conform[ing] their social media habits to maximize interaction and approval of a worldwide audience." *NetChoice*, 152 F.4th at 1017. And the only justification the State offered for private mode was that it "protects minors from being exploited by strangers online." Dkt. No. 33.1 at 53, *NetChoice, LLC v. Bonta*, No. 25-146 (9th Cir. Feb. 27, 2025). No study is required to show that limiting the audience that can

view or interact with a minor's posts is likely to minimize "unsolicited interactions on minors' posts" or the minor's ability to seek approval of a wider audience, *id.*—the logical connection is obvious. Not so with the alleged connection between personalization and harm to minors. Under heightened scrutiny, the State's evidentiary burden differs depending on the speech restriction at issue and its purported justification, so the State cannot satisfy its burden with respect to the personalized-feed provisions by pointing to this Court's analysis of an entirely different provision with a different justification.[5]

The State attempts to create the impression that it has compiled substantial evidence through lengthy string citations. *See, e.g.*, AB32. But none of those citations substantiate the State's claim that personalization causes harm to minors. For example, the State cites over 20 paragraphs from its expert reports for the assertion that its "experts confirm that" the "harm" from personalized feeds "is not merely correlative; it is *causal*." *Id.* Not a single one of those paragraphs supports that assertion. Virtually all of them refer to social-media use generally. The only citation that arguably addresses personalization consists of: (1) an anecdotal report—

[5] The State's reliance on *Gammoh* is likewise misplaced. AB88. There, the Court held that studies on the effects of nude performances were "reasonably believed to be relevant" to a restriction on performances in which the dancers were effectively nude (i.e., wearing nothing but "bikinis and g-strings"). *Gammoh*, 395 F.3d at 1124, 1127 (citation omitted). Unlike nude dancing and effectively nude dancing, social media generally and personalization are not effective equivalents such that studies on the one bear directly on the other. *See* 3-ER-0454–55 ¶¶ 23-24.

published by an advocacy organization that is "Against Big Tech"—stating that a teenager experienced distress when Instagram or TikTok recommended eating-disorder-related content; and (2) one study finding that adults who viewed a personalized rather than chronological Twitter/X feed "experienced higher emotional responses," including happiness. 2-ER-0287–91 ¶¶ 24-25, 28; 1-SER-186 ¶¶ 5-6. Long lists of inapposite citations cannot substitute for actual evidence.

The personalized-feed provisions are also seriously underinclusive and overinclusive. "[T]he notion that a regulation of speech may be impermissibly *underinclusive* is firmly grounded in basic First Amendment principles." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994). SB976 is underinclusive because it "single[s] out" platforms like YouTube while leaving untouched other video-streaming platforms that deliver content to minors through personalized feeds, like Netflix, without providing any "persuasive reason why." *Brown*, 564 U.S. at 802. That underinclusivity "raises doubts" about whether California passed SB976 "to mitigate" the purportedly "addictive nature of … personalized feeds," *NetChoice*, 152 F.4th at 1017, or to "disfavor[] … particular speaker[s]," *Brown*, 564 U.S. at 802—namely, social-media platforms. SB976 is also "seriously underinclusive" because it allows children to access allegedly "dangerous, mind-altering material … so long as one parent … says it's OK." *Id.* The State suggests (at 92) that a law requiring parental consent cannot be insufficiently tailored because a ban would be

more speech-restrictive. But the same argument could have been made in *Brown*. And yet the Court held that the mismatch between the State's justification and a parental-consent mechanism rendered the law fatally underinclusive.

SB976 is also impermissibly overinclusive because it treats all minors the same, even though a 17-year-old's capacity for self-regulation and need for parental oversight obviously differs from a 7-year-old's. The State misses the point in arguing (at 94) that it has the same "interest in safeguarding the mental and physical health of" all "minors." Heightened scrutiny requires the State to tailor speech restrictions to the developmental differences between minors of widely disparate ages.

SB976 also disregards less restrictive alternatives, such as opt-in parental controls on screentime and certain platform features. While intermediate scrutiny may not require that the chosen means be the "*least* restrictive," whether the government's interest could be "satisfied by a less restrictive regulation" is still relevant. *Minority Television Project, Inc. v. FCC*, 736 F.3d 1192, 1204-05 (9th Cir. 2013) (en banc) (emphasis added); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 950 (9th Cir. 2011) (en banc) ("Even under … intermediate scrutiny," "we cannot ignore the existence of these readily available alternatives."); *Yim v. City of Seattle*, 63 F.4th 783, 798 (9th Cir. 2023) (holding that a law "fail[ed] intermediate scrutiny" where there was a regulatory alternative "that

would appear to meet [the State's] goals, but [was] significantly less burdensome on speech"). The Supreme Court has emphasized that intermediate scrutiny requires the government to "demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). And in *Turner II*, the regulation passed intermediate scrutiny only because the government had shown there was no "adequate alternative … for promoting [its] legitimate interests." 520 U.S. at 218.

Here, the State cannot possibly show that there is no adequate, less intrusive alternative because it has affirmatively endorsed one: The State's settlement with Meta requires Meta to "provide" its minor users "with an *option*" for non-personalized feeds. AB2 (emphasis added). As the State acknowledges (*id.*), SB976 is more restrictive because it imposes non-personalized feeds by default, subject only to parental veto. So requiring platforms to provide an option for non-personalized feeds is not just "some imaginable alternative that might be less burdensome on speech," AB87 (quoting *Turner II*, 520 U.S. at 217)—it is a concrete, State-endorsed alternative that empowers minors and is dramatically less speech-restrictive. In other words, the State's insistence that there are no effective less restrictive alternatives rings hollow when it simultaneously touts a voluntary setting as a "landmark" in "protect[ing] the mental and physical health of children," AB1-2—

the same interest it claims to be pursuing here.

Finally, under strict scrutiny, this is not a close case. Given that the State has endorsed the less restrictive alternative of optional non-personalized feeds, it plainly cannot show that barring personalized feeds unless a parent says otherwise is "the least restrictive means of achieving" its interest. *McCullen*, 573 U.S. at 478. The State's argument to the contrary rests predominantly on a different court's fractured decision regarding a different law. The State claims (at AB96) that in *NetChoice, LLC v. Yost*, 180 F.4th 268 (6th Cir. 2026), the "lead opinion" upheld a parental-consent requirement for social-media access under strict scrutiny. But the panel split three ways, and on strict scrutiny, the vote was one to one. While Judge Clay concluded that the law survived strict scrutiny, Judge Batchelder did "not reach the merits of NetChoice's First Amendment claim" and Judge Ritz would have held that the law "fails strict scrutiny." 180 F.4th at 298 (Batchelder, J., concurring in the judgment); *id.* at 316 (Ritz, J., dissenting); *see NetChoice, LLC v. Yost*, No. 26A557 (U.S. Oct. 22, 2026) (granting extension of time to file petition for certiorari).

In any event, Judge Clay's analysis is unpersuasive on its own terms and in many respects is inapplicable to SB976. For example, rather than conduct a rigorous least-restrictive-means inquiry, he accepted at face value Ohio's claim that the "many existing private tools" that allow parents to monitor their children's online activities are ineffective. *Yost*, 180 F.4th at 291 (citation omitted). And while Judge

Clay credited Ohio's evidence about the connection between social media and harm to minors as relevant to a restriction on social-media access, SB976 restricts only personalization, so Ohio's evidence does not help California here. Judge Clay's opinion therefore provides no basis to claim that SB976 survives strict scrutiny.

### B. The Act's Default Restrictions Are Void for Vagueness.

YouTube is also likely to succeed on its argument that the default restrictions' "verified parent" requirement is unconstitutionally vague. The State argues that "'[v]erified' has an ordinary plain meaning." AB97-98. But the phrase "verified parent" does not. If it did, then presumably the question of *how* a platform is to verify parental status would have a ready answer. But the State still has not supplied one. YouTube is not asking for "mathematical certainty," AB97 (citation omitted), but merely sufficient guidance to permit it to "reliably determine what compliance requires," *NetChoice, LLC v. Bonta*, 170 F.4th 744, 767 (9th Cir. 2026).

## II. YOUTUBE AND ITS MINOR USERS FACE IRREPARABLE INJURY WITHOUT AN INJUNCTION.

YouTube and its minor users will suffer irreparable injury to their First Amendment rights if SB976 is not enjoined. The State's contrary claim merely repackages its merits argument. It does not dispute that if SB976 regulates YouTube's speech, this factor necessarily favors an injunction. Nor could it given this Court's holding in *NetChoice* that "a colorable First Amendment claim … establishe[s] irreparable harm." 152 F.4th at 1024 (citation omitted).

The State dismisses YouTube's compliance costs on the ground that "ordinary compliance costs are typically insufficient to constitute irreparable harm." AB98 (citation omitted). But such monetary injury "*is* irreparable when the plaintiff cannot sue the defendant to recover money damages" because the defendant is a State. *Grand River Enters. Six Nations, Ltd. v. Knudsen*, No. 23-35494, 2024 WL 2992503, at *2 (9th Cir. June 14, 2024). And the State's own authority confirms that compliance costs "constitute irreparable injury" when they are "based on … factual allegations," as they are here. *Goldie's Bookstore, Inc. v. Super. Ct.*, 739 F.2d 466, 472 (9th Cir. 1984); *see* 7-ER-1366, 1368 ¶¶ 46, 51.

The State asserts (at 99) that because YouTube already provides an option for non-personalized feeds, complying with SB976 would cost nothing. But SB976 requires YouTube to design and build an entirely new gating mechanism that secures parental consent at the outset and somehow ensures to the State's satisfaction that the person adjusting the default settings is a "verified parent." Therefore, the State's suggestion that YouTube will not incur any compliance costs is fanciful.

Finally, the State does not contest that the "threatened loss of … customers or goodwill" constitutes "irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). It merely disagrees with YouTube's assessment that restricting personalization will "negatively affect users' experiences." 7-ER-1366 ¶ 46. But the State's own experts cite research finding

"that users prefer personalized feeds over alternative feeds such as chronological feeds because they find personalized content more relevant." 3-ER-0468 ¶ 44.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT AN INJUNCTION.

The State seeks to fundamentally alter the speech environment on YouTube, depriving millions of minor users of individually interesting, relevant, and valuable content in personalized feeds, without any evidence that doing so will have a positive impact. The equities and public interest therefore favor a preliminary injunction.

The State's argument about "the health of state residents" hinges on its assertion that "the record reflects abundant evidence demonstrating a causal link between" personalized feeds "and ongoing harms to children." AB99-100. But as explained above, the record contains no such evidence. Meanwhile, enforcement of SB976 would inflict substantial harm by "hinder[ing] young people's ability to explore their passions, learn new skills, and seek help when they need it most." 7-ER-1367 ¶ 47. "[L]egislatively mandating parental consent" to view personalized feeds will also "have unintended effects on vulnerable youth" and "further the digital divide." 7-ER-1366–67 ¶¶ 46-47; *see* OB42.

Nor does the analysis change simply because SB976 was enacted by the legislature. It "would not be equitable or in the public's interest to allow the [S]tate" to enforce an unconstitutional law. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Because YouTube is "likely to succeed on [its] First

Amendment claim, that 'compels a finding' that the equities and public interest favor an injunction." *NetChoice*, 152 F.4th at 1025 (citation omitted).

## CONCLUSION

This Court should reverse the district court's order denying YouTube's preliminary-injunction motion.

Dated: November 3, 2026

Respectfully submitted,

*/s/ Elizabeth B. Prelogar*
Elizabeth B. Prelogar

*Counsel for Plaintiffs-Appellants*
*Google LLC and YouTube, LLC*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-5132

I am the attorney or self-represented party.

**This brief contains** **8,397** **words,** excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[X] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[X] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated ______________.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ Elizabeth B. Prelogar* **Date** November 3, 2026
*(use "*s/[typed name]*" to sign electronically-filed documents)*